The next case is No. 22-1339, NuVasive, Inc. v. Timothy Day. At this time, would Attorney Bush please come to the podium and introduce himself on the record to begin? Good morning, Your Honor. May it please the Court, my name is Brian Bush, and I'm here on behalf of the appellant, Mr. Timothy Day. I would like to reserve one minute for rebuttal if I'm a Chief Judge. Thank you for giving me the opportunity to come and argue this case in front of you. On behalf of Mr. Day, we undertake the challenge of trying to convince this Court to overturn portions of the lower court's decision that related to the award of damages in a non-compete case. Specifically, we are asking this Court for two things. Number one, whether the District Court erred in its application of Delaware law in a breach of restrictive covenant action by assuming damages once isolated breaches were established instead of linking the specific conduct to the general decline in revenue. And then the second question we'll be asking the Court is whether the District Court erred in awarding all discovery-related attorney's fees in an exfoliation dispute. Briefly, Your Honor, my client, Mr. Day, worked as a sales representative for a medical device company called Nuvasiv. There was an underemployment agreement that was governed by Delaware law. The agreement contained restrictive covenant provisions that survived one year post-termination. Mr. Day left the employee of Nuvasiv and went to work for a company. Excuse me, if I might. I think, with all due respect, I think we're familiar with the facts. Sure. I'd like to get to what I understand to be your major contention with respect to damage. You seem to take the view that the Court found a causal connection because of the coincidence or the correlation that Dr. Glazer goes to a competitor and suddenly things change dramatically. One company loses a lot of business, the other one gets a lot of business, but that's just a coincidence. There's no evidence of causal connection. The District Court made some very detailed findings, including the following, and I'll just quickly itemize these for you, which I suggest belies the notion that this was all a coincidence. He's talking about the interaction that Day had with Glazer. Day's phone contact with Glazer increased after he joined Alphatect. When the CEO of Alphatect came to Boston in May 2019 to meet with Glazer and other surgeons, Day organized the itinerary. Day was in the operating room with Glazer when, in May 2019, the critical date was like April 1 of 2019, he used an Alphatect customized product for the first time. Along with Alphatect's CEO, Day and his wife went on a trip to Napa with Glazer and his family in July 2019. And it's all in this time frame that there is this dramatic surge of business for Alphatect and a decline for Nuvasiv. So that strikes me as all in the service of a causal analysis. Day was assiduously attempting, through Dr. Day, to increase the business for his new employer. That's not correlation, that's causation, isn't it? Your Honor, I don't believe it is, and I think for purposes of the appeal, we will concede three important points that Your Honor just brought up. Number one, Nuvasiv's sales declined after Mr. Day left. Alphatect, the competitor's sales increased after Mr. Day left. And as Judge Lopez, you were pointing out, there are isolated instances of breach that the court found and pointed out. For instance, the dinners appearing in a surgery. And so those three points, the increase, the decrease, and the isolated instances of breach, we concede that all of those were found reasonably by the court. What our position is that that is not enough, that the court underdoes... Excuse me, counsel. It seems to me what the court is describing here is a pattern of interaction, not an isolated instance. That seems to be the significance of the court's analysis. This is an ongoing effort by your client, through Dr. Glaser, to substantially increase the sales of their product. Well, and I think, Judge, if you would look at Delaware law and specifically the Omnimax case, that was a very similar case to this one where you had an increase in or a decrease in sales, increase in the competitor, and some isolated instances. And there the court, the Delaware court, told us that that is not enough. There has to be a link between the specific conduct, i.e., the dinners, the attending in the surgeries. There has to be a link between that conduct and the actual loss of revenue that was suffered by the company. And here, your honor, it is our contention that the district court did not take that next step, which is required under Delaware law under the roadmap set out by Omnimax. Without connecting the specific reduction in sales by the Mr. Day's conduct, the court, in essence, skipped the step that it was required to do there. And it's important, Judge, because the Omnimax case told us exactly how the court can go about doing that and how the nuvasive has the burden of doing that, of proving those damages. They can look at an interview and discuss with the customers that actually left the business and go and talk to those customers. And in the Tanner case in Delaware, that's exactly what happened. There were six customers that came in and testified that, look, we left company A and went to company B as a result of the efforts of the employee that was gone. That was not done here. Your argument seems to be an insistence on direct evidence. What I've just recounted is circumstantial evidence of causation, and courts draw inference, draw conclusions on the basis of circumstantial evidence all of the time. Sure. But I think that when you're talking about this type of specific breach in a restrictive covenant environment, which is a little bit different than just a normal breach of contract case, especially in Delaware, you need more than just that inference. There has to be a link. And so, for instance, if nuvasive comes in and says, okay, Mr. Day attended a surgery that Dr. Glazer did, all right, tell us how many surgeries did he attend and what are the damages resulting from those surgeries? If Mr. Day helped get a product approved at the hospital that Dr. Glazer then used, okay, how many products did he use that were approved and what were the damages that were correlated or that went along with that? What we have here over a one-year span is nothing more than a few isolated instances, Judge Lopez, that you keep pointing to. But what is missing from that analysis is what impact those actions of Mr. Day had on the ultimate customers. Nuvasiv did not put up any customer to testify. Its expert witness did not do any expert analysis on causation, simply just assuming that causation existed. And the critical piece is the only customer that actually appeared and testified was Dr. Glazer. And Dr. Glazer testified repeatedly in his testimony that Mr. Day's actions or inactions after he left Nuvasiv had nothing to do with his decision to switch over to the competitive product. Was the court compelled to accept that testimony? In the absence of anything conflicting with that, Your Honor. Well maybe the absence of evidence was a result of the spoliation, I mean that's a real problem for you. Well, I think if we take a look. It's very unusual to have the kind of extended finding on the issue of spoliation. And so wasn't the district court put in the position where it could draw adverse inferences that some of that evidence might have provided more detail about the interaction between Dr. Glazer and your client. But that evidence was not available because of the efforts of your client. And I'm glad you brought that up, Your Honor, because when you look at the actual evidence that was spoliated and you look at the missing text messages. There was only a handful of text messages between my client and Dr. Glazer that predated his departure from Nuvasiv that were missing. So when we look at, actually a close look at the record, it's easy to say the spoliated evidence may have done X, Y, and Z, but when you actually look at the totality of that record, it had no impact on the ultimate findings in this case. Are you arguing that there are no damages proved or that there were too much damages assigned? Well, Your Honor, the court simply allocated the entire amount of the cost revenue. I understand that, but as I understand what you're saying to Judge Lopez, it seems to me that what you're arguing is that though there may have been evidence that could support the finding of some damages, it can't support a finding this large. Correct. Because there was no... But was that argument made to the district court that there should have been more refined analysis? Was it ever argued that... I thought the argument was that there was no basis for causation at all as to any damages. Well, I think that there was no evidence. But I just thought you were suggesting that maybe these isolated instances would support evidence of damages. If Nuvasiv had put on the evidence that the isolated incidents did cause them damages, they simply just said, we're looking at these isolated instances, we've lost revenue, and therefore we win. We win the full amount without having that extra step that's required under the Delaware analysis for the restrictive covenants. Thank you. Thank you. Thank you. At this time, if Counsel for Apolline Nuvasiv would please introduce herself on the record to begin. Thank you. May it please the court, Mary Taylor Gallagher and Holly Polglaes on behalf of the Apolline Nuvasiv. This court should affirm the district court's rulings. First, the district court did not commit clear error when it determined that Nuvasiv had established to a reasonable degree of certainty that Mr. Day's violations of his restrictive covenants caused Nuvasiv to lose profits. And second, the district court did not abuse its discretion when it awarded the reasonable fees and expenses that Nuvasiv incurred. On that first point, just so I understand what's actually in dispute here, is your position that all lost profits could then be attributed to the conduct of the defendant? In this case, Your Honor, the district court actually declined to award all of the profits and damages that Nuvasiv requested. In fact, the district court, in doing a very detailed analysis of the loss of revenue from covenants that moved their business from Nuvasiv to Athetek, the court went through a very detailed analysis of Nuvasiv's expert's opinion as to each of those categories of damages. The court also considered the rebuttal expert opinion of Mr. Day's expert and awarded damages less than what Nuvasiv requested. And what were you requesting that wasn't granted? Yes, Your Honor. We presented a range of damages. The district court, as far as the lost profits for the sales of hardware and biologics, went on the low end of that range that we presented. We actually requested in excess of $2 million in damages. We also requested that the district court award damages for I guess what I'm asking is, your opponent seems to be saying that under Delaware law, the right analysis is you have to trace the illegal conduct by the defendant to actual loss sales. Yes, Your Honor. That is not what is required under Delaware law. And in fact, that ignores the Delaware Supreme Court's decision in the SIGA case, which we cite in our brief. In that case, the Supreme Court specifically finds that where there's any uncertainty about the amount of damages or lost profits caused by a defendant's bad acts, then the defendant bears the risk of that uncertainty. Once the fact of damages is taken outside of the realm of speculation, then the actual amount does not have to be proven with specificity. In this case, the district court granted summary judgment to Nuvasiv on Mr. Day's breaches of his restrictive covenants. This is not our first appearance before this court. In this case, the district court entered a preliminary injunction that this court upheld. On summary judgment, the district court found that Mr. Day had violated that preliminary injunction. The district court held the undisputed facts, established the facts that Judge Lopez recited. It also found that Nuvasiv sustained harm as a result of Mr. Day's breaches, that the there was a causal connection between Mr. Day's acts and the damages suffered by Nuvasiv. I guess it's that last piece, if you could just specify, what's your understanding of what the basis for finding that is? Yes, Your Honor. In this case, their argument seems to be that the district court should ignore all of the other evidence presented to the court during the three-day evidentiary hearing. I guess I'm just trying to figure out, what is your understanding of the affirmative basis for finding causation here? Yes, Your Honor. From the minute that Mr. Day left Nuvasiv and went to Alphatech, he began working to get Alphatech's products approved so that Dr. Glazer could use them at Beth Israel Deaconess Medical Center. It is undisputed that simply because a surgeon wants to use a particular company's products, that he or she may not do so until the hospital approves that product for use and approves the pricing. Mr. Day immediately reached out to his contact at that facility, the contact that he had because of his work at Nuvasiv, and began negotiating that pricing. Even Dr. Glazer admitted at the evidentiary hearing that he had grown frustrated because that wasn't something he was able to do. He could suggest a product, but he was not involved in negotiating pricing and getting that approval. Until that happened, Alphatech's products could not be used by Dr. Glazer at that hospital. Mr. Day was the one that got them approved. Also, Mr. Day immediately began using Nuvasiv's confidential information to get custom instruments made for Dr. Glazer so that he could use those products. In fact, we've got text messages between... And then can you just tie that, the conduct you're describing, to the damages finding? Yes, Your Honor. Once Mr. Day was successful in getting Alphatech's products approved for use at the hospitals where Dr. Glazer operated, then Dr. Glazer immediately began using those products. As Your Honor, Judge Lopez noted... And is the damages calculation... I'm still just trying to get the number. The number of damages, how it fits to this conduct that you're describing. Yes, Your Honor. It is undisputed that as of January 31, 2019, Dr. Glazer had been an exclusive user of Nuvasiv products for the past seven years. Once Mr. Day leaves Nuvasiv, goes to Alphatech, gets the pricing and product approval at the hospitals, gets the custom instruments made so that Dr. Glazer can use these products, supports Dr. Glazer in the OR during his first use of one of the competitive products, the business moves. And it's not just Dr. Glazer. There was evidence at the evidentiary hearing that the two other surgeons that moved their business had never used Alphatech products before Mr. Day began soliciting them. With respect to those other two surgeons, Dr. Shin and Dr. Kwon, that's a very small element of the damage, is it not? It is, Your Honor. It's really Dr. Glazer who is the primary player with respect to damages, isn't that correct? Yes, Your Honor. He was. In fact, Mr. Day had recognized that, again, that Dr. Glazer was an exclusive user of Nuvasiv products and that he was the largest surgeon customer in his entire territory of Massachusetts and Rhode Island.  Mr. Day himself took credit for moving Dr. Glazer's business. In the first quarter of 2020, in reporting to Alphatech, he said that Dr. Glazer moving his business was one of his successes at Alphatech. You simply cannot separate out the work that he did in getting that product and pricing approval, getting the custom instruments made, soliciting Dr. Glazer's business, supporting him in the OR, from the simple fact that they rely on, that Dr. Glazer said, well, I was going to move anyway. Counsel, how would you explain the adverse inference which the court drew from the despoliation of evidence? How did that adverse inference contribute to its damage determination? How would you explain that? Yes, Your Honor. The district court, in its memorandum of decision, stated that it was adopting the adverse inference and that the court found that the spoliated evidence was unfavorable to him in ruling on what damages Nuvasiv was able to prove during the course of the evidentiary hearing. The court then went on to apply that adverse inference to the spoliated messages between Mr. Day and Dr. Glazer and found that, quote, there is a reasonable inference that despite their friendship, some of those deleted texts related to Day's solicitation of Dr. Glazer's business to Alphatech. One thing that's important to note is that Mr. Day and Dr. Glazer both had iPhones and therefore most of the messages that would have been sent between those phones would be iMessages. Even if you are able to obtain cell phone records that might show text messages, they would not show iPhone messages because those messages are not sent via the carrier. So we'll never know how many messages there were between Mr. Day and Dr. Glazer because they both conveniently had the 30-day automatic delete function set on their phone and we weren't able to obtain them. But that adverse inference, in this case, goes to the damages that Nuvasiv was able to prove. In fact, again, the court said that it had to consider that adverse inference in ruling on what damages Nuvasiv was able to prove. Mr. Day does not challenge that adverse inference. Mr. Day does not challenge the summary judgment opinion. Mr. Day takes issue with the court's analysis of the facts that the court determined at both summary judgment and at the evidentiary hearing. The court heard three days of testimony from multiple witnesses and accepted more than 60 pieces of evidence into the record. Mr. Day would have this court ignore all of that evidence, ignore the adverse inference, ignore that the court found him in contempt for violating the preliminary injunction, ignore the testimony of Dr. Glazer that is not beneficial to him, and rely solely on the cherry-picked testimony that he's provided to the court. If there are no further questions, we ask that the court affirm the district court's ruling. Thank you. Thank you, counsel. At this time, would Attorney Bush please reintroduce himself on the record to begin his one-minute rebuttal? Sure. Brian Bush for the appellant. Just to clarify the timeline and the record that opposing counsel was citing to, when Dr. Glazer came in and testified, it was abundantly clear, and he testified under oath, that he began the process of transitioning to AlphaTec one year before Mr. Day left, that Dr. Glazer is the one that initiated that process. He started the process with the hospital of getting AlphaTec products approved. He did test AlphaTec product cases in the hospital way before Mr. Day even left NuVasa. And so that process had already started long before Mr. Day left. The most telling part of Dr. Glazer's testimony was when he testified that he is the one that told Mr. Day in March of 2020 that he was transitioning to AlphaTec and that Mr. Day should join him. It was not the other way around. It was not Mr. Day trying to recruit Dr. Glazer to go to AlphaTec, the competitor. Dr. Glazer made that decision. He took all of the steps necessary to get that process underway. And he is the one that told Mr. Day that he was going to be transitioning. It was not the other way around. Thank you. Thank you. That concludes argument in this case.